# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A WARRANT AUTHORIZING THE SEARCH OF 924 South Stewart Avenue, Apartment 16F, Springfield, Greene County, Missouri. | No. 21-SW-2068DPR (UNDER SEAL) |

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEARCH WARRANT

I, Nicholas Mittag, am a Task Force Officer ("TFO") of the United States Drug Enforcement Administration ("DEA"), United States Department of Justice, and being duly sworn, declare and state:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am an officer with the Springfield, Missouri, Police Department ("SPD"), where I am currently assigned to the Special Investigations Section ("SIS"). I have been assigned to SIS for twelve years. I am also currently deputized by the DEA as a TFO and have been since July 2016. I have been a law enforcement officer for over 19 years. My primary responsibilities for the past twelve years have been to investigate drugs, gang activity, illegal firearms, and violent and repeat offenders in the Springfield, Missouri, area. I have attended schools and seminars related to the fields of crime scene investigation and drug investigation. I have conducted several investigations and assisted in the issuance and execution of numerous search warrants related to drug crimes and weapon violations. During the course of

1

my law enforcement career, I have participated in several complex investigations of drug trafficking organizations dealing in cocaine, marijuana, methamphetamine, heroin, and other controlled substances. I have participated in numerous drug investigations that have resulted in the seizure of cocaine, marijuana, heroin, and methamphetamine. I am familiar with and have used normal methods of investigation, including, but not limited to, visual surveillance, questioning of witnesses, search and arrest warrants, informants, pen registers, confidential sources and undercover agents, and court-authorized wire interceptions. My specialized training has included, but is not limited to, investigation of the manufacture, possession, and distribution of controlled substances listed within the Controlled Substance Act; executing search and arrest warrants involving drug offenses; gathering drug and non-drug evidence; undercover assignments; supervision and utilization of informants; clandestine laboratories; smuggling; money laundering; monitoring drug-related conversations in other cases via court-authorized electronic eavesdropping; testifying in court as a witness in drug-related matters; and court-authorized interception of wire and electronic communications.

2.      During the course of my law enforcement career and employment with the DEA, I have participated in and planned numerous surveillance operations, including physical surveillance, wire surveillance, and electronic surveillance. I have also interviewed numerous confidential sources, cooperating witnesses, and defendants regarding various criminal activities, including drug trafficking. These interviews have included discussions of the use and meaning of code words in the sale and distribution of controlled substances. I have testified in grand jury proceedings and at trial. I have also written reports and analyzed records and documents in conjunction with the preparation of affidavits requesting authorization for the interception of wire and electronic communications. Through my assignment with the DEA, I have gained knowledge

2

in the use of various investigative techniques, including the use of physical surveillance, undercover agents, confidential sources, cooperating witnesses, controlled purchases of illegal drugs, electronic surveillance (to include T-III operations), consensually monitored recordings, investigative interviews, trash searches, mail covers, financial investigations, grand jury subpoenas, and the execution of federal search and arrest warrants.

3.     This affidavit is based on an ongoing investigation by the DEA. All the information within this affidavit is based upon my personal knowledge, information provided from other law enforcement officers, and court-authorized Title-III intercepts.

4.     For the purpose of this affidavit, heroin and fentanyl are used in conjunction while referring to said narcotics, because fentanyl and fentanyl analogs are often sold to customers who believe they are purchasing heroin. Based on my training and experience, I know that fentanyl distributors often refer to their product as heroin, when in fact they are distributing fentanyl or fentanyl analogs.

## **PURPOSE OF AFFIDAVIT**

5.     This affidavit sets out circumstances and information that gives me probable cause to believe that Aaron RAINER has been engaged in a conspiracy with members of a drug trafficking organization (DTO), specifically the Marktwain JOHNSON DTO or JOHNSON DTO, to distribute and possess with the intent to distribute heroin, unlawful use of a communication facility, and use of premises to facilitate those drug trafficking activities, in violation of Title 21, United States Code, Sections 841(a)(1), 843, 846, and 856, in the Western District of Missouri. Based upon my training, experience, and participation in the investigation and seizure of controlled substances, I know:

3

a) that individuals involved in the manufacturing and distribution of controlled substances maintain books, records, receipts, notes, correspondence, ledgers, and other records, relating to the transportation, ordering, and/or distribution of controlled substances, even though sometimes in code; such individuals commonly front (deliver on consignment) controlled substances and maintain such records in doing so;

b) that it is common practice for those involved in illicit drug trafficking of controlled substances to secret contraband, proceeds of drug sales, and records of drug transactions in secure locations within the residence, or other property, for ready access, and to conceal them from law enforcement authorities;

c) that persons involved in illicit drug trafficking conceal in their residences or other property caches of drugs, large amounts of currency, financial instruments, and other assets of value that are the proceeds of drug transactions; and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money related to engagement in drug trafficking activities; and that persons involved in illicit drug trafficking often purchase substantial assets including cars, boats, and homes with the proceeds of drug transactions in manners to conceal the true source of the funds;

d) that persons engaged in illicit drug trafficking maintain on the premises, paraphernalia for packaging, cutting, weighing, and distributing controlled substances, and equipment used in the packaging, weighing, and otherwise preparing for the distribution of controlled substances;

e) that persons engaged in illicit drug trafficking maintain on the premises addresses and telephone numbers in books or papers and in contact lists in cell phones which reflect the

4

names, addresses, and/or telephone numbers for their sources, customers, and associates related to their drug trafficking activities, even though sometimes in code;

f) that persons engaged in illicit drug trafficking maintain on the premises photographs and/or video cassettes of co-conspirators, associates, assets, and controlled substances;

g) that persons engaged in illicit drug trafficking maintain on the premises tickets, schedules, papers, notes, receipts, and other items relating to domestic and foreign travel;

h) that persons involved in distributing controlled substances keep and maintain firearms and other explosive devices to protect themselves from other drug traffickers and from apprehension by law enforcement officers; and

i) that persons who engage in drug distribution activity utilize cell phones and other communication devices in order to store contact lists and to arrange for delivery and distribution of controlled substances.

6.      The controlled substance that is the primary focus of this investigation is heroin. Based on information supplied by confidential sources, controlled purchases, as well as court-authorized T-III interceptions, surveillance, and analysis of information gathered by investigators to this date, it is believed that known members of the JOHNSON DTO are directly responsible for supplying a substantial amount of heroin in the Springfield, Missouri, metropolitan area.

**LOCATION FOR WHICH PERMISSION TO SEARCH IS SOUGHT**

7.      This affidavit is submitted in support of an application for a warrant authorizing the search of one location in the Western District of Missouri.

**The location sought to be searched and the description is as follows**:

8.      **924 South Stewart Avenue, Apartment 16F, Springfield, Greene County, Missouri.** The residence of 924 South Stewart Avenue, Apartment 16F, is located in the Page Crossing

5

Apartment Complex. The Page Crossing Apartment Complex consists of six buildings. Building F is positioned at the far south end of Stewart Avenue in a cul-de-sac at the end of Stewart Avenue, south of Page Street. Building F is the only building marked with the numerals "924." Building F is the only building that is positioned at the end of the cul-de-sac and sits on the southeast corner of the cul-de-sac. Building F is positioned at an angle and has two entry points, one on the northeast side and one on the southwest side. Building F is a two-story apartment building with a brown brick exterior and tan doors and trim. "924F" is displayed in tan numerals on the northeast side of the building on the east side of the northeast entry door. Apartment 16F is on the second floor and is located on the southeast corner of the building. There is a hallway that separates the apartments on the northwest side of the building and the southeast side of the building. There are five doors on the southeast side of the hallway, four are apartments and one appears to be a maintenance closet. Apartment 16F is the fifth door from the north end of the hallway, or the first door from the south end of the hallway and faces northwest. There is a back sliding glass door that faces southeast. The door to apartment 16F is brown in color and has "16F" displayed in white numerals on a black placard. (Hereinafter referred to as the "Target Location," further described in Attachment A.)

9.     Except as otherwise noted, the information set forth in this affidavit has been provided by me or provided to me by law enforcement agents or officers of the DEA. Unless otherwise noted, whenever in this affidavit I assert that a statement was made, the information was either heard by me or provided by another law enforcement officer with whom I have spoken or whose report I have read and reviewed. The officer(s) may have based their information on either direct or hearsay knowledge. The information resulting from physical surveillance, except where otherwise indicated, is not necessarily from personal observations, but was provided directly or indirectly by

6

members of the DEA or other law enforcement officers who conducted the surveillance. Likewise, any information pertaining to vehicles and/or registrations, personal data on subjects and record checks has been obtained through the National Crime Information Center ("NCIC") and/or the Law Enforcement Data System ("LEDS"). All subscriber, toll record, pen register, and trap and trace information contained herein were obtained by court order or subpoena.

10.     As this affidavit is being submitted for the limited purpose of securing authorization for the search of the listed location and vehicle for physical evidence related to the conspiracy to distribute drugs and drug distribution, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish the foundation for an order authorizing the search of the listed location and vehicle.

## INVESTIGATION OVERVIEW

11.     In the summer of 2020, SPD and the DEA began investigating a heroin drug trafficking organization (DTO) being operated in Springfield, Missouri, by Marktwain JOHNSON. The investigation to date has shown the Marktwain JOHNSON DTO is distributing multiple grams of heroin each day in Springfield, Missouri. Investigators have conducted controlled purchases of heroin from members of the DTO and conducted extensive surveillance on members of the DTO.

12.     On January 20, 2021, I applied for and received a Title-III wiretap search warrant in the Western District of Missouri (Order 21-WT-0001-MDH) authorizing the interceptions of wire and electronic interceptions on Marktwain JOHNSON's telephone. On January 20, 2021, investigators began receiving and monitoring those interceptions.

13.     During the course of those interceptions, investigators learned Marktwain JOHNSON was being supplied heroin by individuals in Chicago, Illinois. During the course of those interceptions, investigators learned Marktwain JOHNSON would sometimes get smaller amounts of heroin from

Aaron RAINER (hereinafter referred to as "RAINER") while Marktwain JOHNSON was waiting to obtain a larger amount of heroin from Chicago, Illinois.

14.     During the course of those interceptions, investigators learned RAINER was distributing controlled substances.    Specifically, on January 22, 2021, Marktwain JOHNSON, utilizing telephone number (417) 444-7291, sent an outgoing text to RAINER utilizing telephone number (417) 619-6386 which read, "Can I come get what you got."  Furthermore, on January 22, 2021, Marktwain JOHNSON, utilizing telephone number (417) 444-7291, received an incoming telephone call from RAINER.  During the intercepted telephone call, Marktwain JOHSON stated, "My man just took the last 15 from me, do you want me to work some, It's up to you," "Or do you want me to, do you want me to buy em?"  Based on my training and experience, I know that often when dealers in controlled substances used the term "work" they are referring to selling controlled substances.  Marktwain JOHNSON went on to say, "Do you want me to move em' or do you want to give them to me for the price man?"  RAINER replied, "You can help me move, you can help me move mine with my money, I don't care about nothing else."  Marktwain JOHNSON then replied, "I'll try to have them moved today but that's how it is."  Based on my training and experience, and the aforementioned conversation, I believe Marktwain JOHSON and RAINER were discussing Marktwain JOHSON selling RAINER's product.

15.     On February 19, 2021, I applied for and received a Title-III wiretap search warrant in the Western District of Missouri (Order 21-WT-0003-MDH) authorizing the interceptions of wire and electronic interceptions as well as precision location information (PLI) on Marktwain JOHNSON's telephone number, (316) 550-7166 and RAINER's telephone, (417) 619-6386.  On February 19, 2021, investigators began receiving and monitoring those interceptions and PLI information.

### FACTS INVOLVING THE TARGET LOCATION

16.     On February 20, 2021, investigators conducted surveillance of RAINER in conjunction with court-authorized wire and electronic intercepts of RAINER's telephone, (417) 619-6386. At approximately 4:50 p.m., RAINER received an incoming call from an unknown male utilizing telephone number (417) 299-7564 (hereinafter referred to as "UM7564"). During that interception, RAINER told UM7564, "I need that bread." Based on my training and experience, I know that often times the term "bread" refers to money. Over the next several communications, UM7564 agreed to meet RAINER at RAINER's residence.

17.     At 7:00 p.m., I established surveillance at 924 South Stewart Avenue, Springfield, Missouri (hereinafter referred to as the "Target Location building"). At approximately 7:14 p.m., I observed RAINER arrive in the parking lot of the apartment complex driving his black BMW SUV (Missouri license plate XG4K7L) and park. I observed RAINER exit the vehicle and go inside the Target Location building through the northeast door.

18.     At approximately 7:25 p.m., I observed a red Honda hatchback (Missouri license plate LG4 K6Z) pull into the parking lot of the Target Location building and park. I observed the driver of the Honda was a white male. That license plate was registered to "Misty and Michael Hilgert at 2764 East Monroe Terrace, Springfield Missouri". I was unable to confirm the identity of the unknown white male at that time.

19.     At approximately 7:27 p.m., RAINER received a text message from UM7564, which read, "I just parked."

20.     At approximately 7:33 p.m., I observed RAINER exit the north door of the Target Location building, walk over to the Honda, and get in the front passenger seat with the unknown white male.

21.     At approximately 7:37 p.m., I observed RAINER exit the Honda and walk back into the northeast door of the Target Location building. At the same time, I observed the Honda drive away.

22.     During the time of this meeting between RAINER and UM7564, the PLI on RAINER's telephone showed his location to be on the south corner of the Target Location building, which is the location inside the building of the Target Location. The accuracy of the PLI at that time showed to be within ten feet.

23.     Based on the aforementioned intercepted communications, and based on my training and experience, I believe UM7564 brought money to RAINER.

24.     Later on the same day, February 20, 2021, investigators conducted surveillance of Marktwain JOHNSON in conjunction with court-authorized wire and electronic intercepts of Marktwain JOHNSON's telephone (316) 550-7166.

25.     At approximately 8:11 p.m., Marktwain JOHNSON received an incoming telephone call on telephone number (316) 550-7166 from an unknown male (UM) utilizing telephone number (417) 414-9911, who Marktwain JOHNSON referred to in past conversations as "Jeremy," (hereinafter referred to as "UM9911"). During the call, UM9911 told Marktwain JOHNSON he had "$150." Marktwain JOHNSON told UM9911 he (Marktwain JOHNSON) would call someone.

26.     At approximately 8:12 p.m., RAINER received an incoming call from Marktwain JOHNSON utilizing telephone number (316) 550-7166. During the telephone call, Marktwain JOHNSON stated "Wol you at home?" ("Wol" is a nickname Marktwain JOHNSON uses for RAINER) to which RAINER replied, "Yeah, what's going on?" Marktwain JOHNSON asked RAINER, "Can I come get a (unintelligible)". RAINER replied "A hundo". Marktwain

JOHNSON replied "Seventy a piece, he got seventy dollars." Based on my training and experience, I know that seventy to one hundred ("a hundo") dollars is the price for a half gram of heroin.

27.     At approximately 9:00 p.m., I observed Marktwain JOHNSON arrive at the Target Location building driving a gray Lincoln MKZ (Missouri license plate LG5 L3U) and park. I observed Marktwain JOHNSON exit his vehicle and walk into the Target Location building through the northeast door.

28.     At approximately 9:06 p.m., I observed Marktwain JOHNSON exit the Target Location building through the northeast door, get back into his vehicle and leave the location. Surveillance was ended at that time.

29.     During the time of this meeting between RAINER and Marktwain JOHNSON, the PLI information on RAINER's telephone showed his location to be on the south corner of the building which is the location inside the building of the Target Location. The accuracy of the PLI at that time showed to be within ten feet.

30.     On February 21, 2021, investigators conducted surveillance of RAINER in conjunction with court-authorized wire and electronic intercepts of RAINER's telephone (417) 619-6386.

31.     Previously, on February 20, 2021, at approximately 5:28 p.m., RAINER received an incoming text message from (417) 450-0363 being utilized by a female believed to be Leann Britain. The text message read, "Hey its Junior can you hit my line got something to talk to you bout. 417 346 0479." Based on the later conversations, I believe "Junior" was utilizing Britain's telephone to contact RAINER at this point. RAINER did not immediately respond to this message.

32.     At approximately 10:54 p.m., RAINER received an incoming text message from telephone (417) 346-0476, believe to be utilized by Joseph Barnes, which read, "What's good? I need another

11

cream.  Same as before for 120.  I need to get a hammer too you got anything you wanna get rid of."  RAINER received a message after that one, that read, "Lemme know bout the cream. We can talk bout that other ting face to face."  Based on my training and experience, I know that often times "cream" can be used as a term for methamphetamine.  Based on my training and experience, I know that often times "hammer" could be referring to a firearm or drug paraphernalia.

33.     On February 21, 2021, at approximately 11:12 a.m., RAINER received an incoming text from telephone number (417) 346-0476.  The text message read, "Bout to be coming your way if its cool".  RAINER replied with a text that read, "Who is this".  At approximately 11:24 a.m., RAINER received another text message from (417) 346-0476, which read, "Junior".

34.     At approximately 12:23 p.m., RAINER received a text message from telephone number (417) 450-0363, which read, "Walking out the door now, gotta grab sum bread along the way and will be there id say 30 mins."  Based on my training and experience, I know that often times the term "bread" refers to money.

35.     At approximately 1:05 p.m., RAINER sent a text message to telephone number (417) 450-0363, which read, "What you think you trying to do".

36.     At approximately 1:35 p.m., RAINER placed an outgoing call to (417) 450-0363.  During part of the call the female stated, "...we need uh, a girly..." and "...I think he needs a ball..."  RAINER responded in the affirmative and they ended the call.  Based on my training and experience, I know that often times the term "girly" refers to an amount of drugs being sold such as a gram and the term "ball" refers to an amount of drugs being sold such as an eighth of an ounce.

37.     At approximately 1:50 p.m., I observed a maroon Pontiac G-6 (Missouri license plate RD4 K4T) arrive in the parking lot of the Target Location building and park. That license plate was registered to "Joseph Barnes" at 1326 North Prospect Avenue, Springfield, Missouri.

12

38.  At approximately 1:52 p.m., RAINER received an incoming call from (417) 450-0363, in which the unknown female stated, "Hey, we are down here."

39.  At approximately 1:56 p.m., I observed RAINER exit the northeast door of the Target Location building. I observed RAINER walk over to the Pontiac and get into the back driver's side of the vehicle.

40.  At approximately 2:02 p.m., I observed RAINER exit the vehicle and walk back into the north door of the Target Location building. At the same time, I observed the Pontiac leave the location.

41.  Investigators followed the Pontiac to the parking lot of a Kum & Go, located at 959 South Glenstone Avenue, Springfield, Missouri.

42.  I observed the vehicle pull up to the air compressor and park. I observed the driver of the vehicle get out, and at that point, I was able to identify the male by file photograph as Joseph Barnes. I was also able to see the female passenger and I was able to identify her by file photograph as Leann Britain.

43.  Based on my training and experience, I know that drug deals often happen in short meetings in gas station parking lots or other parking lots.

44.  During the time of this meeting between RAINER, Britain, and Barnes, the PLI on RAINER's telephone showed his location to be on the south corner of the building, which is the location inside the building for the Target Location. The accuracy of the PLI at that time showed to be within ten feet.

45.  On February 23, 2021, at approximately 2:59 p.m., Marktwain JOHNSON, utilizing telephone number (316) 550-7166, received an incoming call from UM9911. During the call, UM9911 stated, "I got a bill." Based on my training and experience, I know that often times a

13

"bill" means one hundred dollars. Marktwain JOHNSON replied by saying, "Cause I ain't doing this he spends like two G's and makes four if he sells half that's all he makes." UM9911 stated, "Yeah that I mean that's literally everything I have is (unintelligible)." Marktwain JOHNSON replied, "Yeah that's basically how it is that wy see you he go 160 I cant tell him go cheaper cause everybody else be wanting it deuce." UM9911 later responded, "Let me see if I can come up with 60 dollars." Based on my training and experience, I believe Marktwain JOHNSON and UM9911 were discussing the price for a full gram of heroin and Marktwain JOHNSON was informing UM9911 that his source will sell for $160, but other sources would be seeking $200 (deuce) for the same quantity of drugs.

46.     At approximately 3:03 p.m., Marktwain JOHNSON, utilizing telephone number 316-550-7166, received an incoming telephone call from UM9911. During the call, Marktwain JOHNSON and UM9911 agreed to meet at UM9911's residence.

47.     At approximately 3:42 p.m., Marktwain JOHNSON called RAINER on telephone number 417-619-6386, and told RAINER to get an "order" ready. Based on my training and experience, I believe when Marktwain JOHNSON said "order" he meant an amount of drugs.

48.     At approximately 3:53 p.m., Marktwain JOHNSON received a call from UM9911 who told Marktwain JOHNSON that UM9911 was waiting on him (Marktwain JOHNSON). Marktwain JOHNSON said he (Marktwain JOHNSON) was on the way to meet.

49.     At approximately 4:13 p.m., Marktwain JOHNSON called RAINER. RAINER asked where Marktwain JOHNSON was and Marktwain JOHNSON indicated he was on the way and would be at RAINER's in "seven minutes."

50.     At approximately 4:37 p.m., investigators observed Marktwain JOHNSON's gray Lincoln MKZ travelling on Page Street near Glenstone Avenue. Approximately one minute later, investigators observed the Lincoln pull into the parking lot of the Target Location building.

51.     At approximately 4:40 p.m., investigators observed Marktwain JOHNSON exit the Lincoln and walk to the northeast door of the Target Location building and enter the building.

52.     At approximately 4:46 p.m., investigators observed Marktwain JOHNSON and RAINER walk out of the northeast door of the Target Location building and stand in the parking lot talking.

53.     At approximately 4:52 p.m., investigators observed RAINER get into his black BMW SUV and leave the area.

54.     At approximately 4:58 p.m., investigators observed Marktwain JOHNSON leave the area in his gray Lincoln. Surveillance was terminated at that time.

55.     During the time of this meeting between RAINER and Marktwain JOHNSON, the PLI on RAINER's telephone showed his location to be on the south corner of the building, which is the location inside the building for the Target Location. The accuracy of the PLI at that time showed to be within ten feet.

56.     On February 24, 2021, at approximately 3:55 p.m., RAINER, utilizing telephone number 417-619-6386, sent an outgoing text message, to telephone number 417-210-5628, a telephone number believed to be utilized by Kelsey Bolin that read, "Don't take all day now I am leaving today frfr". Bolin responded with, "I won't, Im only $200 short and I'm on my way to get it now."

57.     At approximately 4:10 p.m., investigators established surveillance at the Target Location building.

58.     At approximately 4:22 p.m., RAINER received a text message from Bolin, who said she was having trouble finding a ride.

59.     At approximately 4:28 p.m., investigators observed RAINER enter the northeast door to the Target Location building.

60.     At approximately 4:34 p.m., investigators observed RAINER exit the Target Location building and get into his black BMW SUV and leave the parking lot.

61.     At approximately 4:37 p.m., RAINER sent a text to Bolin that read, "OMW".

62.     At approximately 4:41 p.m., investigators observed RAINER pull into the driveway of 1824 East Monroe Street, Springfield, Missouri, Bolin's known address.

63.     At approximately 4:42 p.m., RAINER sent a message to Bolin that read, "Open the door". At approximately the same time, investigators observed RAINER walking from the house to his black BMW SUV.

64.     At approximately 4:44 p.m., RAINER received a message from Bolin that read, "I'm not there, I'm omw to walgreens on East Sunshine and then home". RAINER and Bolin continued to text back and forth about figuring out when they would meet up. RAINER sent Bolin one text that read, "I am out here dirty communicate". Based on my training and experience, I believe when RAINER stated he was "dirty" he meant he was carrying drugs in his black BMW SUV.

65.     Subsequent to those calls, investigators were unable to see if RAINER actually met with Bolin, and the calls were unclear if they met, however investigators were able to see RAINER go to Bolin's residence at 1824 East Monroe Street during the surveillance.

66.     Later in the evening, at approximately 6:49 p.m., RAINER received a message from Bolin that read, "Nothin. I got money for you. I have branson people on the way with a nice amount. I was just gonna holler when they left. You want me to see where I'm at and text you the amount". RAINER then received another message from Bolin that read, "I have a g in my cash app, I'm going to pull it off though. I guess Drew is coming her again to get some more of his stuff. I'm

not saying anything about our business." Based on my training and experience, I know that often a "g" is referring to $1,000. Throughout the course of this investigation, investigators have learned members of the DTO use "Cash App," an application which allows users to transfer money to other users, to move money between each other to pay for narcotics.

67.     RAINER responded with a message to Bolin that read, "Cool cash app it to me." No other calls or communications were intercepted to indicate RAINER and Bolin eventually met with each other.

68.     On February 25, 2021, at approximately 4:00 p.m., SPD officers conducted surveillance on Bolin's residence located at 1824 East Monroe Street, Springfield, Missouri. SPD officers conducted a traffic stop on a vehicle after it left the location. Following a probable cause search of the vehicle, that individual was found to be in possession of approximately two grams of a white powder substance that based on the officer's training and experience, he believed to be fentanyl, and approximately one gram of a gray rock substance that based on the officer's training and experience, he believed to be heroin. In a post-*Miranda* interview, the individual who was found to be in possession of the suspected fentanyl and heroin admitted he/she had purchased the substance from Bolin at 1824 East Monroe Street, Springfield, Missouri.

69.     Subsequently, SPD officers applied for and received a Greene County, State of Missouri, search warrant for 1824 East Monroe Street. At approximately 9:53 p.m., SPD officers served the search warrant at 1824 East Monroe Street. During the search of the residence, officers seized white powder substance from several locations inside the residence that based on the officer's training and experience, he believed to be fentanyl. Bolin was arrested as a result of that search warrant.

70.     On February 27, 2021, at approximately 1:32 p.m., RAINER placed an outgoing call to telephone number (417) 685-9821, being utilized by Lannetta BROWN (hereinafter referred to as "BROWN"). During that conversation, RAINER told BROWN he (RAINER) was going to need her (BROWN) to "bust a move for him that day." RAINER stated he (RAINER) would call BROWN later and told BROWN to call RAINER when BROWN was at RAINER's house.

71.     At approximately 2:30 p.m., investigators established surveillance at the Target Location building.

72.     At approximately 4:13 p.m., investigators observed a silver Audi (Missouri license plate EC7 A6W) arrive at the location. Investigators observed BROWN get out of the Audi and walk to the northeast entrance of the Target Location building.

73.     At approximately 4:19 p.m., investigators observed BROWN walk out of the apartment building and get back into the Audi and leave the area.

74.     At approximately 7:51 p.m., RAINER placed an outgoing call to BROWN, utilizing telephone number (417) 685-9821. RAINER told BROWN to go back to the residence and he (RAINER) would tell her (BROWN) what to do.

75.     At approximately 7:54 p.m., RAINER placed an outgoing call to (417) 299-7564, a telephone number being utilized by Michael HILGERT (hereinafter referred to as "HILGERT"). RAINER told HILGERT to meet "someone" where "they normally meet at." HILGERT stated he (HILGERT) would call when he (HILGERT) arrived.

76.     At approximately 7:56 p.m., RAINER placed an outgoing call to (417) 207-7808, a telephone number being utilized by Mikala MURAD (hereinafter referred to as "MURAD"). MURAD asked RAINER to be "fronted" a "gram." Based on my training and experience, I know that often the word "fronted" means giving someone narcotics without payment up front, with the

18

expectation the payment would be received at a later time. MURAD then asked, "would you do a g and a half for me" and RAINER replied he (RAINER) would give her (MURAD) "two." Based on my training and experience, I know that often the letter "g" can be referring to a gram of narcotics.

77.      At approximately 8:05 p.m., investigators observed BROWN arrive back at the Target Location building driving the Audi. Investigators observed BROWN exit the vehicle and walk into the northeast entrance of the Target Location building.

78.      At approximately 8:07 p.m., RAINER received an incoming call from BROWN, utilizing telephone number (417) 685-9821. RAINER told BROWN to go into the kitchen. RAINER then stated, "A'right. By the, by the, by the refrigerator, it's a can…a container with, with some, with some, with some, um, chips…with some, um, Ritz crackers on it." RAINER explained to BROWN what she (BROWN) was looking for was behind the Ritz crackers. BROWN acknowledged she (BROWN) found the container. RAINER and BROWN then had the following conversation which was transcribed as follows by the person monitoring:

RAINER:      "You're gonna, you're gonna get two (2) of them, two (2) of them balls outta there."

BROWN:      "Two (2)? They look the same, right"

RAINER:      "Two (2), two (2)  of the one…"

BROWN:      "They look the same, correct?"

RAINER:      "Yeah, they look the same. They got…you got gray and one white."

BROWN:      "Hold on. No, all of 'em got gray and white in it."

RAINER:      "But not all of 'em. Yeah, okay, yeah, yeah, they do, but I'm talking about the big one. Okay, it's it's four (4) big ones. You see it?"

BROWN:      "It's four (4), they look the same, and one (1) big one.

RAINER: "Okay. The four (4) that look the same, get two (2) of them out."

BROWN: "Okay"

RAINER: "Okay. Now, the big one, you gotta go in it. I need you to open it up."

BROWN: "Okay."

RAINER: "I need you to get two (2), two (2) of them little white ones." [Pause] [U/I]

BROWN: "It's not, it's not no bag. It's like [U/I] two (2) white things?"

RAINER: "Yeah, two (2) white things"

BROWN: "Okay. Okay, I see what you're saying. Okay. I got two (2)."

RAINER: "A'right. Put the rest back. Everything I told you to out, keep."

BROWN: "Okay."

RAINER: "A'right"

BROWN: "A'right"

RAINER: "Now, somebody…they, they…both of 'em finna pull up. [Inhales] one. One person gonna pull up, and you're gonna give him, give him the two (2) with the, with the, with the gray with the one (1) white."

BROWN: "What? Two (2) with gray and…"

RAINER: "The white."

BROWN: "One (1) of the whit things?"

RAINER: "No. I'm saying, you gonna give him two (2) of the..remember I told you to get two (2) out with the…"

BROWN: "The gray and white in it, right?"

RAINER: "Yeah, yeah. You gonna give him both of them."

BROWN: "Okay"

20

RAINER:      "And the one, and, and…I told you to get two (2) of them little whites out."

BROWN:       "Uh-huh"

RAINER:      "Somebody gonna…A girl gonna…a lady gonna come. You gonna give her them."

BROWN:       "Okay"

RAINER:      "When he come, he gonna give you almost 1,200 dollars."

BROWN:       "Okay. What's almost 12?"

RAINER:      "11 something"

BROWN:       "Huh?"

RAINER:      "1100 and something"

BROWN:       "Okay. And what the girl gonna give me?"

RAINER:      "Huh?"

BROWN:       "What the girl gonna give me?"

RAINER:      "She ain't gonna give you nothing. Just give it to her."

BROWN:       "Okay"

RAINER:      "She, she Cashapp'ed me"

BROWN:       "A'right. Is that it?"

RAINER:      "Huh?"

BROWN:       "Is that it?"

RAINER:      "Yeah."

BROWN:       "I'm going to sit outside [U/I]"

RAINER:      "Huh?"

BROWN:       "I said I'm going to sit outside [U/I]"

RAINER:      "A'right, that's cool."

| | |
|---|---|
| BROWN: | "A'right" |
| RAINER: | "A'right" |
| BROWN: | "A'right, bye." |
| RAINER: | "Okay, bye.". |

Based on my training and experience, and based on the aforementioned telephone call, I believe RAINER was directing BROWN where the controlled substances were hidden in the Target Location. I also believe, based on my training and experience and the aforementioned conversations, RAINER was directing BROWN to distribute the controlled substances to his customers.

79. At approximately 8:12 p.m., investigators observed a vehicle pull into the parking lot and park next to the dumpsters.

80. At approximately 8:12 p.m., RAINER received an incoming call from HILGERT. During the call, HILGERT stated he was parked by the dumpster. RAINER stated his "girl" is going to "show up" in a "silver Audi truck" and HILGERT stated he (HILGERT) sees the vehicle. HILGERT stated he has $1,100 and will Cash App the rest later. RAINER stated HILGERT still owes money.

81. At approximately 8:13 p.m., investigators observed BROWN walk out of the northeast entrance of the Target Location building and walk to the Audi.

82. At approximately 8:14 p.m., investigators observed HILGERT walk to the Audi and get into the passenger side with BROWN.

83. At approximately 8:15 p.m., investigators observed HILGERT get out of the Audi and walk back to the other vehicle and leave.

84.    At approximately 8:15 p.m., RAINER received an incoming call from BROWN. RAINER told BROWN the next person will arrive in less than "eight minutes." BROWN confirmed the amount of money she (BROWN) just received was $1,100.

85.    At approximately 8:19 p.m., RAINER placed an outgoing call to MURAD. MURAD stated she was about to "pull up." RAINER told MURAD there was going to be a "woman in an Audi truck." MURAD confirmed she could see the "truck with the women."

86.    At approximately 8:20 p.m., investigators observed a silver Volkswagen Jetta (Missouri license plate CX6 J5V), pull into the parking lot. DEA SA John Stuart observed MURAD exit the vehicle and walk up to the Audi. Investigators observed MURAD open the front passenger door of the Audi, then immediately close it, walk back to Jetta, and leave the area.

87.    On March 2, 2021, RAINER utilizing telephone number (417) 619-6386 exchanged several text messages with MURAD.

88.    At approximately 9:54 a.m. RAINER received an incoming text message from MURAD which read, "I got 2. And if you'll front on the second I'll love ya foreverrrr lmao" Based on my training and experience, I know that often times the word "front" means to give someone a certain amount of narcotics expecting to be paid later.

89.    At approximately 10:01 a.m., RAINER received an incoming telephone call from MURAD, which was transcribed as follows by the person monitoring:

MURAD:    [U/I]

RAINER:    Hello?

MURAD:    Are you back?

RAINER:    Nah. I ain't gonna [U/I] later.

[VOICES OVERLAP]

| | |
|---|---|
| MURAD: | Oh shit. |
| RAINER: | Late tonight, early morning. |
| MURAD: | So, I won't be able to... |
| RAINER: | Yeah. You gonna be able to see somebody today. |
| MURAD: | Okay. |
| RAINER: | But the person ain't gonna be able to probably see you 'til 1:00. |
| MURAD: | Shit. Why is that? |
| RAINER: | That's the time they got off work. |
| MURAD: | Damn. |
| RAINER: | That's the time they lunch break. |
| MURAD: | That's the time their lunch is? |
| RAINER: | Mm-hmm. |
| MURAD: | Shit. Um, will I need to, like, go meet 'em somewhere or something? |
| RAINER: | Huh? |
| MURAD: | Will I need to, like, meet 'em at their work or something? |
| RAINER: | You gon' meet 'em at lunch time at 1:00 exactly, gonna be by my [CALL INTERRUPTS] [U/I] where we be meeting at. |
| MURAD: | Oh, okay. Where we usually do? |
| RAINER: | Yeah. Yeah. |
| MURAD: | Okay. So be there at 1:00? |
| RAINER: | Yeah. |
| MURAD: | A'right. I will. |
| RAINER: | A'right. Thank you. |

MURAD:      Yup. Thank you.

RAINER:     A'right.

MURAD:      Bye.

90.    Based on the aforementioned intercepted telephone calls, investigators conducted surveillance at the Target Location.

91.    At approximately 1:11 p.m., investigators observed MURAD arrive at the Target Location building in a silver Volkswagen Jetta (Missouri license plate CX6 J5V), and park.

92.    At approximately 1:13 p.m., investigators observed a silver Audi (Missouri license plate EC7A6W) arrive at the Target Location building and park. Investigators observed BROWN get out of the Audi and walk to the apartment building and enter the northeast entrance of the Target Location building.    At approximately 1:16 p.m., investigators observed BROWN walk into the interior of the building and into the Target Location (Apartment 16F).  Investigators observed BROWN exit the Target Location building less than a minute later, clutching an item in her right hand.

93.    At approximately 1:17 p.m., investigators observed BROWN walk over to the Jetta and get inside the vehicle with MURAD.  At approximately 1:18 p.m., investigators observed BROWN exit the Jetta and the Jetta left the area.

94.    Investigators followed MURAD as she left the meeting location.  SPD officers conducted a traffic stop on MURAD following the meeting with BROWN.  During a consensual search, SPD officers located approximately two grams of a gray powder substance in MURAD's possession. SPD officers relinquished custody of the gray powder substance to the DEA to be retained as evidence.  I viewed the gray powder substance and based on my training and experience, I believed

it to be heroin. I field tested the gray powder substance and it showed the positive indication for heroin.

95.     Due to the entrance to apartment #16F being in an interior entry way, investigators have been unable to covertly conduct surveillance on the apartment door to see RAINER come or go from it, however investigators observed BROWN come and go from apartment #16F. I checked commercial databases and found the Target Location to be listed in one database as RAINER's address. There is an active utility account in the name "Tyshawn Campbell." It is unknown to investigators at this point who "Tyshawn Campbell" is or the relationship to RAINER. Based on my training and experience, I know that often times drug traffickers will use different names on utility accounts to thwart law enforcement. The registration on RAINER's black BMW SUV lists the Target Location as RAINER's address. PLI as documented above, shows RAINER's phone to be located in or near apartment 16F during the above-mentioned transactions (within a ten-foot radius). PLI information consistently shows RAINER's telephone to be in apartment 16F within the Target Location.

96.     Furthermore, on February 24, 2021, an SPD undercover officer attempted contact with RAINER at the Target Location, while the PLI showed RAINER's telephone to be within the Target Location. The undercover officer spoke to a male through the door, but the male would not open the door to speak face to face with the undercover officer. The undercover officer later listened to past intercepted telephone calls of RAINER's voice. The undercover officer could not determine for sure if the male inside was RAINER due to RAINER having a muffled voice while speaking from behind the closed door. However, the undercover officer believed the male subject who was inside the Target Location had a voice that resembled RAINER.

26

97.     Based on the facts set forth above, I believe that RAINER is currently using his primary residence, the Target Location, to keep contraband related to his illegal heroin distribution business. Based on the facts above, PLI information, and intercepted telephone calls of RAINER, I believe RAINER is currently located in Chicago, Illinois. Based on the facts above, I believe RAINER has controlled substances currently inside his residence at the Target Location, and RAINER is directing BROWN to distribute to customers. Based on the facts above, I believe that RAINER utilizes the Target Location to package drugs for distribution and may keep materials used to package drugs and other items related to his drug distribution business located at the Target Location. Based upon the factual information contained in this affidavit, and the common practices of drug traffickers of which I am aware, I have probable cause to believe that heroin, and items commonly associated with the distribution of heroin, are located at the Target Location, which is more fully described in Attachment A, and I respectfully request authority to seize those items which are listed more fully in Attachment B, "PROPERTY TO BE SEIZED."

98.     There is an ongoing investigation in this case involving RAINER and others regarding the distribution of heroin and other controlled substances. Disclosure of the information contained in this affidavit, as well as the corresponding orders and applications, would seriously jeopardize this investigation concerning RAINER and others. I am requesting that the affidavit and other accompanying documents be sealed because of the ongoing nature of the investigation.

99.     Due to the ongoing and uncertain nature of this investigation, affiant requests that this search and seizure be permitted during any of the hours of the day or night and that notice be delayed for a period of 30 days.

100.    I, Nicholas Mittag, a TFO with the DEA, upon the foregoing facts, my training and experience, and from information which I have obtained from other law enforcement officers,

respectfully submit that there is probable cause to believe that the items described in Attachment B, which are evidence, contraband, fruits of crime, other items illegally possessed, property designed for use, intended for use, or used in committing a crime concerning violations of Title 21, United States Code, Sections 841(a)(1), 843, 846, and 853, and will be located inside the Target Location more fully described in "Property to be Searched" under Attachment A (Target Location).

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Nicholas Mittag
Task Force Officer
U.S. Drug Enforcement Administration

Subscribed and sworn to before me in my presence via telephone on the ___2nd___ day of March, 2021.

HONORABLE DAVID P. RUSH
Chief United States Magistrate Judge
Western District of Missouri

28